BOSTCO LLC and Parisian, Inc.,
Plaintiffs-Appellants-Cross-Respondents,†

v.

MILWAUKEE METROPOLITAN SEWERAGE DISTRICT,
Defendant-Respondent-Cross-Appellant.

Court of Appeals

*Nos. 2007AP221, 2007AP1440. Oral argument March 22, 2011.
—Decided May 24, 2011.*

2011 WI App 76

(Also reported in 800 N.W.2d 518.)

† Petition for Review filed.

621

628

On behalf of the plaintiffs-appellants-cross-respondents, the cause was submitted on the briefs of *Mark A. Cameli, Rebecca Frihart Kennedy, Lisa Nester Kass* and *Joseph W. Voiland* of *Reinhart Boerner Van Deuren S.C.*, of Milwaukee. There was oral argument by David E. Frank.

On behalf of the defendant-respondent-cross-appellant, the cause was submitted on the brief of *G. Michael Halfenger* and *William J. Katt* of *Foley & Lardner LLP*, of Milwaukee; *Kevin J. Lyons* and *Matthew R. McClean* of *Davis & Kuelthau, S.C.*, of Milwau-

kee; and *Michael J. McCabe, Susan B. Anthony* and *James H. Petersen* of *Milwaukee Metropolitan Sewerage District*, of Milwaukee. There was oral argument by G. Michael Halfenger.

Amicus Curiae brief was filed by *Claire Silverman* and *Daniel Olson* of *League of Wisconsin Municipalities*, of Madison.

Before Fine, Brennan and Anderson, JJ.

¶ 1. BRENNAN, J. Bostco LLC and Parisian, Inc. (collectively "Bostco" unless otherwise noted) brought this lawsuit against the Milwaukee Metropolitan Sewerage District ("the District") for damages sustained to the Bostco-owned Boston Store building in downtown Milwaukee. Bostco alleged that the District's negligent maintenance and operation of the Deep Tunnel—a nineteen mile, thirty-two foot diameter, sewage and stormwater tunnel, running 300 feet below downtown Milwaukee—permitted groundwater in the downtown area to excessively seep into the Deep Tunnel, dewatering the ground underneath the Boston Store. Bostco contended that, as a result of the dewatering, the water table in the area of the Boston Store dropped and the timber piles upon which the store was founded began to rot and shift due to exposure to air and soil settlement, resulting in millions of dollars in damages.

¶ 2. Bostco's amended complaint against the District alleged four claims: (1) negligence; (2) continuing nuisance; (3) inverse condemnation; and (4) excavation protection under WIS. STAT. § 101.111 (2009–10).[1] The District filed a motion to dismiss the amended complaint, alleging that Bostco had failed to meet the

_____

[1] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

630

notice-of-claim requirements set forth in WIS. STAT. § 893.80(1). The trial court denied the motion and determined that Bostco substantially complied with § 893.80(1)'s requirements. The District later filed for summary judgment, and the trial court granted the motion, in part, dismissing Bostco's claims for inverse condemnation and statutory excavation protection. Bostco's negligence and nuisance claims proceeded to a jury trial.

¶ 3. Bostco only prevailed on the negligence claim at trial. On that claim, the jury found that Bostco suffered $9 million in past and future harm, but that Bostco was thirty percent contributorily negligent. With respect to the nuisance claim, the jury concluded that although the District interfered with Bostco's use and enjoyment of its building, Bostco did not suffer "significant harm," thereby defeating the claim.

¶ 4. Both parties filed post-verdict motions, and, after a hearing, the trial court: (1) upheld the jury's finding that Bostco was thirty percent contributorily negligent; (2) reversed the jury's finding that Bostco knew or should have known of its injury prior to June 4, 1997; (3) upheld the jury's verdict that Bostco incurred no significant harm from the District's interference with Bostco's full use and enjoyment of its property; (4) concluded that the District did not enjoy governmental immunity pursuant to WIS. STAT. § 893.80(4); and (5) applied the $50,000 municipal damage cap in § 893.80(3). The effect of the trial court's post-verdict rulings was to limit Bostco's recovery to $100,000, i.e., $50,000 for each Bostco and Parisian.

¶ 5. Following the trial court's post-verdict order applying the $50,000 cap on damages, Bostco filed a motion for injunctive relief, claiming that it was irreparably harmed by the District's negligence and that the

imposition of the caps prevented it from obtaining an adequate remedy under the law. As relief, Bostco asked the trial court to order the District to line that portion of the Deep Tunnel near the Boston Store with concrete. The trial court granted Bostco's motion, ordering the District to fully line the Deep Tunnel with concrete one-half mile north and one-half mile south of the Boston Store.[2]

¶ 6. Bostco now appeals, arguing that the trial court erred by: (1) refusing to change the jury's finding that Bostco did not suffer "significant harm," despite also awarding Bostco millions of dollars in past damages; (2) applying the $50,000 municipal damage cap set forth in Wis. Stat. § 893.80(3); (3) failing to change the jury's finding that Bostco was contributorily negligent; (4) dismissing Bostco's inverse condemnation claim on summary judgment; and (5) dismissing Bostco's Wis. Stat. § 101.111 claim on summary judgment.

¶ 7. The District cross-appeals, arguing that the trial court erred by: (1) failing to conclude that the District is immune from liability pursuant to Wis. Stat. § 893.80(4); (2) reversing the jury's finding that Bostco's claims were barred by the statute of limitations; (3) concluding that Bostco substantially complied with the notice and itemization of relief requirements set forth in § 893.80(1); and (4) ordering injunctive relief after trial and after the deadline for filing post-verdict motions had passed.

¶ 8. We affirm all but two of the trial court's orders, albeit some on different grounds. We overturn

_____

[2] The Honorable Jeffrey A. Kremers was originally assigned to the case and presided over the trial and post-verdict motions. Thereafter, due to judicial rotation, the Honorable Jean W. DiMotto was assigned to the case. Judge DiMotto entered the order granting Bostco's motion for injunctive relief.

the trial court's order refusing to reverse the jury's nuisance finding that Bostco did not suffer significant harm and its order granting Bostco injunctive relief.

## DISCUSSION

¶ 9. We will address each of the parties' arguments in the context of Bostco's causes of action, that is, negligence, followed by nuisance, then inverse condemnation, and WIS. STAT. § 101.111. Finally, we will address the trial court's injunction order.

## I. Negligence

¶ 10. We turn first to Bostco's negligence claim; the only claim on which Bostco succeeded before the trial court. The jury found that the District was "negligent in the manner in which it operated or maintained the tunnel near the Boston Store" and that the negligence was "a cause of the claimed damage to the Boston Store foundation." Furthermore, the jury concluded that $3 million would "fairly and reasonably compensate" Bostco for past damages and $6 million would "fairly and reasonably compensate" Bostco for any future damages. However, the jury also found Bostco thirty percent contributorily negligent, and during the post-verdict hearing, the trial court applied the municipal damage cap set forth in WIS. STAT. § 893.80(3), reducing Bostco's total relief to $100,000, to wit, $50,000 for each Bostco and Parisian.

¶ 11. With respect to negligence, we turn first to the District's argument on cross-appeal that it is entitled to immunity pursuant to WIS. STAT. § 893.80(4). Second, we address the application of the municipal tort cap on damages set forth in § 893.80(3). Third, we look to the trial court's decision to change the jury's answer

633

regarding the applicable statute of limitations. Finally, we address the District's claim that Bostco failed to properly serve the District with a notice of claim or an itemization of damages pursuant to § 893.80(1).

¶ 12. Because we conclude that the municipal tort cap on damages applies, we do not address Bostco's claim that the trial court erred in permitting the District to pursue a contributory negligence defense. *See Clark v. Waupaca Cnty. Bd. of Adjustment*, 186 Wis. 2d 300, 304, 519 N.W.2d 782 (Ct. App. 1994) (We address only dispositive issues and decide appeals on the narrowest possible ground.).

A. *Immunity: The District is not entitled to immunity under WIS. STAT. § 893.80(4).*

¶ 13. In its cross-appeal, the District argues that all of Bostco's claimed damages were caused by the District's initial design decision not to fully line the Deep Tunnel with concrete. The District contends that its design decisions are discretionary, and therefore, it is entitled to immunity for those decisions under WIS. STAT. § 893.80(4).[3] Additionally, the District argues that there is no evidence in the record demonstrating that it violated a ministerial duty for which the District would not be immune.

¶ 14. Bostco counters that the trial court limited the evidence at trial to those acts involving the District's duty to maintain and operate the Deep Tunnel—acts which are ministerial in nature and for which the District does not enjoy immunity under WIS.

---

[3] WISCONSIN STAT. § 893.80(4) states: "No suit may be brought against any [government entity] . . . for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions."

STAT. § 893.80(4)—and that it was upon those acts that the jury found the District to be negligent. Additionally, Bostco argues that the District waived its immunity argument when it failed to object to the trial court's pretrial order limiting the evidence to the District's maintenance and operation of the Deep Tunnel after August 7, 1992.

¶ 15. To begin, we are unpersuaded by Bostco's waiver argument. It is true that the District did not object to the trial court's order limiting the evidence at trial to only the District's acts that occurred after it had assumed responsibility for maintenance and operation of the Deep Tunnel on August 7, 1992. However, the District's act of agreeing to the date beyond which it was responsible for maintenance and operation of the Deep Tunnel was not a tacit waiver of the defense of immunity, which it had expressly asserted in its amended answer. *See State v. Ndina*, 2009 WI 21, ¶ 29, 315 Wis. 2d 653, 761 N.W.2d 612 ("[W]aiver" is "the intentional relinquishment or abandonment of a known right.") (citation and quotation marks omitted). The trial court noted as much in pretrial motions.

¶ 16. We agree with Bostco on the balance of its immunity arguments, however, and conclude that the evidence shows that the District was not entitled to immunity under WIS. STAT. § 893.80(4) because the District's failure to repair the excessively leaking Deep Tunnel was the result of its negligent maintenance and operation of the Deep Tunnel, conduct which was ministerial in nature.

██

¶ 17. Not all tortious acts of a governmental body are immune from liability under WIS. STAT. § 893.80(4). As the Wisconsin Supreme Court has stated, "so far as governmental responsibility for torts is concerned, the

rule is liability—the exception is immunity." *Holytz v. City of Milwaukee*, 17 Wis. 2d 26, 39, 115 N.W. 2d 618 (1962), *abrogated in part on other grounds by* § 893.80. If the nature of a negligent act is ministerial and there exists a ministerial duty, then the governmental body is not entitled to immunity under the statute. *See Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 2005 WI 8, ¶¶ 61–62, 277 Wis. 2d 635, 691 N.W.2d 658 (*"MMSD"*).

¶ 18. WISCONSIN STAT. § 893.80(4) immunizes government entities from " 'liability for legislative, quasi-legislative, judicial, and quasi-judicial acts.' " *MMSD*, 277 Wis. 2d 635, ¶ 54 (citation omitted). Such acts " 'have been collectively interpreted to include any act that involves the exercise of discretion and judgment.' " *Id.* (citation omitted). However, the statute "affords *no* protection to a municipality for nondiscretionary or 'ministerial' acts." *Id.* (emphasis added).

> A ministerial act, in contrast to an immune discretionary act, involves a duty that is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.

*Id.* (citation and quotation marks omitted). Whether the District's failure to stop the Deep Tunnel from draining the groundwater underneath the Boston Store is discretionary or ministerial conduct under § 893.80(4) presents a legal issue which we review independently of the trial court. *See Miesen v. DOT*, 226 Wis. 2d 298, 304, 594 N.W.2d 821 (Ct. App. 1999).

¶ 19. The first step in the immunity analysis is to determine the nature of the tortious act. *MMSD*, 277 Wis. 2d 635, ¶ 59 ("[T]he proper inquiry is to examine the character of the underlying tortious acts."). The tortious act here was the District's failure to stop the Deep Tunnel from excessively leaking.

¶ 20. Bostco's experts testified that after August 7, 1992, the date on which the District agreed that it took over maintenance and operation of the Deep Tunnel, up until the time of trial, the Deep Tunnel's continued operation permitted excessive amounts of water from the surrounding soil to leak into the tunnel. In fact, one expert described the Deep Tunnel as "a sink, in other words a drain, for shallow groundwater beneath Milwaukee." The experts' collective testimony shows that the Deep Tunnel's continued operation after August 7, 1992, dewatered the aquifer lying below downtown Milwaukee. This excessive dewatering caused the soil underneath downtown buildings to settle so that supporting timber piles were exposed to the air, which caused them to shift and rot, damaging Bostco's property.

¶ 21. The Deep Tunnel was not designed to excessively leak; instead, the Deep Tunnel excessively leaked because the District failed to properly operate and maintain the tunnel. The Deep Tunnel was designed to carry stormwater and sewage in a partially lined tunnel dug 300 feet below ground. Initially, the Deep Tunnel was to be fully lined with one foot of concrete. Later, the Deep Tunnel's design was changed to include only a partial concrete lining.

¶ 22. The February 1982 Inline Storage Facilities Plan ("the ISFP") setting forth the initial planning for the Deep Tunnel and approved by the District, shows that the Deep Tunnel was *not designed* to dewater the

alluvial soils around the tunnel. In fact, the District called this a "worst case scenario[]." The Deep Tunnel was designed "to have no significant short- or long-term effect on the local hydrogeologic system." It is true, as the District argues, that the Department of Natural Resources ("DNR") required that there be some, very limited, positive inward flow of water from the soil into the Deep Tunnel, but the DNR required a limited inward flow of not more than 200 gallons per day adjusted for the depth of the tunnel. *See* WIS. ADMIN. CODE § NR 110.13(2)(k)1. (July 2010).[4] By all accounts, the Deep Tunnel was not designed to draw excessive amounts of water into the tunnel and thereby drain the aquifer underneath downtown Milwaukee.

¶ 23. From the very beginning, the District knew that the Deep Tunnel would require maintenance and that maintenance might include adding a concrete lining to parts previously unlined. The initial plan described the maintenance that the Deep Tunnel might need over the years to avoid the "worse case scenario[]" of dewatering the Milwaukee aquifer as: "removal of solid deposits, removal of fallen rock, repair of deteriorated linings and placement of concrete lining in deteriorated, unlined areas."

¶ 24. The District admittedly took over the maintenance and operation of the Deep Tunnel on August 7, 1992. " '[M]aintenance' " is the " 'work of keeping something in proper condition; upkeep.' " *Hocking v. City of Dodgeville*, 2010 WI 59, ¶ 48, 326 Wis. 2d 155, 785 N.W.2d 398 (citation omitted). The proper condition of

---

[4] WISCONSIN ADMIN. CODE § NR 110.13(2)(k)1. states that groundwater infiltration into sanitary sewer systems "may not exceed 0.19 cubic meters per centimeter pipe diameter per kilometer per day (200 gallons per inch of pipe diameter per mile per day)."

the Deep Tunnel is as a conduit for sewage and storm-water, not a drain of the aquifer underneath downtown Milwaukee.

¶ 25. The Wisconsin Supreme Court has recently reaffirmed that negligence based on a failure to repair or maintain a public work may not be immune under WIS. STAT. § 893.80(4). In *MMSD*, the supreme court found that "the City [of Milwaukee] may be liable for its negligence in failing to repair the leaky water main." *Id.*, 277 Wis. 2d 635, ¶ 9. Similarly, in *Lange v. Town of Norway*, 77 Wis. 2d 313, 253 N.W.2d 240 (1977), the supreme court concluded that the town was not im-mune for a failure to maintain a floodgate, though it would be immune for negligent dam design. *Id.* at 319–20. In *Menick v. City of Menasha*, 200 Wis. 2d 737, 547 N.W.2d 778 (Ct. App. 1996), this court noted that operating and maintaining a sewer system is not a discretionary or immune act. *Id.* at 745.

¶ 26. In *MMSD*, a case upon which both parties rely, the Wisconsin Supreme Court addressed the very issue presented here: whether a governmental entity's negligent act of failing to repair a leaking water main was ministerial or discretionary. *Id.*, 277 Wis. 2d 635, ¶ 9. In an ironic twist, the District was the plaintiff in *MMSD* and took the opposite position to the one it takes now. *See id.*, ¶ 23. There, the District argued that the City was not immune because it "had a ministerial duty to maintain its water mains so that they did not cause damage to other property." *Id.*

¶ 27. Distinguishing between those acts of the City that are discretionary and those that are ministe-rial, the supreme court held in *MMSD*:

> that decisions regarding the adoption, design, and implementation of public works are discretionary, leg-islative or quasi-legislative acts subject to immu-

639

> nity. . . . Therefore, the City is immune from suit relating to its decisions concerning the adoption of a waterworks system, the selection of the specific type of pipe, the placement of the pipe in the ground, and the continued existence of such pipe.

*Id.*, ¶ 60 (citations omitted). However, the court also held that the City was not entitled to immunity for its " 'failure to maintain as to a condition of disrepair or defect or a failure to operate.' " *Id.*, ¶ 56 (citation omitted).

¶ 28. Concluding that the City may be potentially liable for its failure to repair the leaking water main, the court in *MMSD* remanded the case back to the trial court to determine whether the City had *notice* of the leaking water main. *Id.*, ¶¶ 61–62. The court concluded that it could not determine whether the City breached its ministerial duty to repair until it knew whether the City had notice that the pipe was leaking. *Id.*, ¶ 62. Thus, whether the City had notice that the water main was leaking and could potentially interfere with the use and enjoyment of another's property was central to determining if its duty to repair the water main was " 'absolute, certain and imperative,' " that is, ministerial and subject to liability. *Id.* (citation omitted). In so holding, the court intimated that sometimes the consequences of failing to repair a problem can be so great, that if the legally responsible government entity has notice of both the problem and the consequences, it has a legal duty to fix the problem such that "nothing remains for judgment or discretion." *See id.*, ¶¶ 54, 61, 62 (citation and quotation marks omitted).

¶ 29. Consequently, we look to whether the District had notice after August 7, 1992, that the one-mile stretch of the Deep Tunnel near the Boston Store was dewatering the area and causing damage to the Boston Store.

¶ 30. First, the 1982 ISFP put the District on notice that the Deep Tunnel could dewater the downtown area and cause structural damage to surrounding buildings. While the ISFP stated that the Deep Tunnel "should be constructed and operated to have no significant short- or long-term effect on the local hydrogeologic system," the document conceded that "the possibility of permanent lowering of the dolomite aquifer" existed and described such a drawdown in groundwater as a "worst case scenario[]." The District admitted at trial that it understood that "too great a drawdown of groundwater from a zone wherein wooden piles are located might have a deleterious effect on such wooden piles if the wooden piles were otherwise in sound condition." Furthermore, a critical structure report received by MMSD in 1984 specifically identified Boston Store as a "critical structure" that could potentially be damaged by such a drawdown of groundwater.

¶ 31. The ISFP also notified the District that maintenance of the Deep Tunnel may be necessary to ensure that such a hazardous drawdown of groundwater did not occur, suggesting that the District perform *annual* inspections of the Deep Tunnel. But at trial the District's legal chief admitted that the District had performed only two manned inspections of the Deep Tunnel since taking over its maintenance and operation, one in 1992 and one in 2002. Furthermore, the District's own technical documents state that "[m]aintenance [of the Deep Tunnel] may include removal of solid deposits, removal of fallen rock, repair of deteriorated linings and *placement of concrete lining in deteriorated, unlined areas*." (Emphasis added.)

¶ 32. Second, the expert testimony admitted at trial demonstrates that years after the District undertook maintenance and operation of the Deep Tunnel in

641

August 1992, the Deep Tunnel was in fact draining the aquifer in the downtown area at such a rate that it should have been obvious to the District that the timber piles upon which the Boston Store was founded were at risk. While DNR regulations required that some groundwater flow into the Deep Tunnel to prevent sewage from flowing out, *see* WIS. ADMIN. CODE § NR 110.13(2)(k)1., the experts agreed that the inflow of water was so great that it had dewatered the aquifer underneath Milwaukee's downtown, which, in turn, had damaged the Boston Store building. More specifically, the experts testified as follows:

- Dr. Leland Jan Turk, a groundwater expert, testified that in his expert opinion the Deep Tunnel "drains water from the shallow dolomite aquifer beneath downtown Milwaukee," creating a sink for shallow groundwater, at a rate four times greater than before the Deep Tunnel's construction.

- Dr. Charles Nelson, a consultant in the field of underground engineering, testified that "[b]ecause the tunnel was not fully lined with a watertight lining, the excessive loss of groundwater under the Boston Store continues more than 14 years after construction" and that "[t]he tunnel must have a complete lining installed with all joints and cracks sealed to stop groundwater inflow and drawdown."

- Dr. Richard Stehly, a civil engineer, focusing on soil engineering, testified that the operation of the Deep Tunnel caused, and will continue to cause, Boston Store to suffer large structural column movement due to downdrag on the piles and pile rot from the dewatering of the soil.

¶ 33. Third, the District *admitted* that it knew of the harmful conditions. The District conceded at trial that as early as June 14, 1993, it knew that the Deep

642

Tunnel was drawing down the alluvial aquifer in the area of downtown Milwaukee in the location of the Boston Store and that five to eight million gallons of water per day were pumped from the Deep Tunnel each night as of May 25, 1995, "primarily from groundwater inflows into the system from the dolomite aquifer surrounding the Deep Tunnel."

¶ 34. Based on all of the above evidence, it is obvious that the District was on notice that the Deep Tunnel was severely dewatering the downtown area and causing property owners like Bostco harm. The District had identified the Boston Store as a "critical structure" that was at particular risk to dewatering because the timber piles upon which the store was built would begin to rot and shift as the ground was dewatered and the soil began to settle. Consequently, there were sufficient "facts that would lead a reasonable waterworks operator to conclude that there was a harmful condition on its property that would, in the course of ordinary care, require an inspection." *See MMSD*, 277 Wis. 2d 635, ¶ 79.

¶ 35. The District argues that the evidence fails to show that it had a ministerial duty because Bostco cites to no law or regulation that requires the District to repair the Deep Tunnel. It points to testimony suggesting that the District was in compliance with the DNR regulation regarding how much groundwater could flow into the Deep Tunnel when adjusted for the depth of the tunnel. *See* WIS. ADMIN. CODE § NR 110.13(2)(k)1.

¶ 36. We conclude that the District had the legal responsibility to maintain and operate the Deep Tunnel. It stipulated to as much. Thus, its duty to maintain the Deep Tunnel was an "absolute, certain and imperative" duty that is imposed by law. *See MMSD*, 277 Wis. 2d 635, ¶ 54 (citation and quotation marks omit-

ted). Bostco need not show any additional law or rule violation to establish the District's ministerial duty.

¶ 37. In this case, like in *MMSD*, once the District, as the responsible public entity, had notice that the Deep Tunnel was draining the aquifer in downtown Milwaukee to the detriment of property owners, it had an "absolute, certain and imperative" duty to repair the Deep Tunnel. *See id.* The District knew as early as 1993 that the Deep Tunnel was drawing down the aquifer in the vicinity of the Boston Store, which it identified as a "critical structure." The District admitted that allowing the Deep Tunnel to drain the aquifer would be a "worst case scenario[]," and that maintenance of the tunnel may require more concrete lining. As the entity responsible for the Deep Tunnel, and its awareness that the Deep Tunnel was causing structural damage to the Boston Store, the District had a ministerial duty to repair the Deep Tunnel. It did not. Thus, it enjoys no immunity for its negligence under WIS. STAT. § 893.80(4).

B. *Municipal Damage Cap: The $50,000 cap on municipal tort liability set forth in WIS. STAT. § 893.80(3) applies.*

¶ 38. The jury awarded Bostco $6.3 million (i.e., $9 million minus its thirty percent contributory negligence finding) in past and future damages. However, after the trial, the trial court granted the District's post-verdict motion to reduce the damages to $100,000 (i.e., $50,000 for Bostco and $50,000 for Parisian) pursuant to WIS. STAT. § 893.80(3), which places a damage cap on municipal liability for claims founded in tort.[5] Bostco makes three arguments in support of its position that the court's application of the damage cap

---

[5] WISCONSIN STAT. § 893.80(3) states, in relevant part:

was an error: (1) the cap is unconstitutional on its face because it violates the equal protection clause of the Wisconsin Constitution; (2) the cap is unconstitutional as applied to Bostco; and (3) the District waived the damage cap and is judicially estopped from invoking it now. We will address each argument in turn.

### 1. WISCONSIN STAT. § 893.80(3) is constitutional on its face.

██

¶ 39. Bostco first argues that WIS. STAT. § 893.80(3) violates the equal protection clause of the Wisconsin Constitution[6] because it "treats differently governmental tort victims who suffer over $50,000 in damages and those who suffer less" and lacks a rational basis for the distinction. We disagree.

¶ 40. To prevail on its equal protection claim, Bostco must demonstrate that WIS. STAT. § 893.80(3) "treats members of similarly situated classes differently" and that there is no rational basis on which to support making a distinction between the classes. *See Nankin v. Village of Shorewood*, 2001 WI 92, ¶ 11, 245 Wis. 2d 86, 630 N.W.2d 141 ("[W]here the statutory

Except as provided in this subsection, the amount recoverable by any person for any damages, injuries or death in any action founded on tort against any . . . governmental subdivision . . . shall not exceed $50,000. . . . No punitive damages may be allowed or recoverable in any such action under this subsection.

[6] Wisconsin's equal protection clause is included in article 1, section 1 of the Wisconsin Constitution and states: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." WIS. CONST. art. I, § 1.

classification does not involve a suspect class or a fundamental interest, we will sustain the classification if there exists any rational basis to support it."). Whether § 893.80(3) violates the equal protection clause and is therefore unconstitutional is a question of law that we review *de novo*. *See Kohn v. Darlington Cmty. Sch.*, 2005 WI 99, ¶ 12, 283 Wis. 2d 1, 698 N.W.2d 794.

¶ 41. Bostco's argument—that the municipal tort liability cap distinguishes between those plaintiffs with relatively minor injuries costing less than $50,000 and those plaintiffs with relatively severe injuries costing more than $50,000, without a rational basis—is essentially that statutory caps on municipal tort liability are irrational. But the Wisconsin Supreme Court has already held, on multiple occasions, that a rational basis for such caps exists.

¶ 42. The supreme court first addressed the constitutionality of statutory caps on municipal tort liability in *Stanhope v. Brown County*, 90 Wis. 2d 823, 280 N.W.2d 711 (1979). In *Stanhope*, the plaintiff challenged WIS. STAT. § 81.15 (1971–72), which limited municipal liability to $25,000 for damages caused by highway defects, and WIS. STAT. § 895.43 (1971–72), the predecessor to WIS. STAT. § 893.80(3),[7] which limited municipal liability to $25,000 for claims founded in tort.[8] *See Stanhope*, 90 Wis. 2d at 836. The plaintiff argued that the caps were unconstitutional because they treated differently, without any rational basis, victims of government negligence and victims of non-government negligence. *Id.*

---

[7] WISCONSIN STAT. § 895.43 was renumbered as WIS. STAT. § 893.80 by 1979 Wis. Laws, ch. 323, § 29.

[8] The legislature later raised the statutory cap from $25,000 to $50,000. *See* 1981 Wis. Laws, ch. 63, § 2.

¶ 43. The supreme court disagreed and held that the legislature had a rational basis for imposing statutory caps on municipal tort liability. The court concluded that "[i]t is within the legitimate power of the legislature to take steps to preserve sufficient public funds to ensure that the government will be able to continue to provide those services which it believes benefits the citizenry." *Id.* at 842. Consequently, the supreme court held that "the legislature's specification of a dollar limitation on damages recoverable allows for fiscal planning and avoids the risk of devastatingly high judgments[,] while permitting victims of public tortfeasors to recover their losses up to that limit." *Id.*

¶ 44. Later, the supreme court again addressed the constitutionality of statutory caps on municipal tort liability in *Sambs v. City of Brookfield*, 97 Wis. 2d 356, 293 N.W.2d 504 (1980). The plaintiff in *Sambs* also challenged the municipal tort liability caps set forth in Wis. Stat. §§ 81.15 and 895.43(2) (1965–66). *Sambs*, 97 Wis. 2d at 361–62. The plaintiff argued that §§ 81.15 and 895.43(2) were unconstitutional because other statutes did not cap municipal liability for government torts. *Sambs*, 97 Wis. 2d at 358–62. Specifically, the plaintiff pointed to Wis. Stat. § 345.05 (1965–66), which did not limit state and municipal liability for damages caused by the negligent operation of a motor vehicle owned by the State and operated in the course of municipal business. *Sambs*, 97 Wis. 2d at 362. The plaintiff argued that the damage caps set forth in §§ 81.15 and 895.43(2) violated the equal protection clause because "the Wisconsin legislature . . . afforded victims of governmental torts different legal rights on the basis of the nature of the tort committed and that there [was] no rational basis for this differentiation." *Sambs*, 97 Wis. 2d at 361.

¶ 45. Again, the supreme court disagreed. The supreme court in *Sambs* held that the caps on municipal tort liability were rational, noting that it is "the legislature's function to evaluate the risks, the extent of exposure to liability, the need to compensate citizens for injury, [and] the availability of and cost of insurance." *Id.* at 377. The supreme court concluded that in enacting WIS. STAT. §§ 81.15 and 895.43 (1965–66), the legislature "could reason that a maximum should be imposed on the amount recoverable in those situations where the burden of unlimited liability may be substantial and the danger of disrupting the functioning of local government by requiring payment of substantial damage awards may be great." *Sambs*, 97 Wis. 2d at 377–78.

¶ 46. Here, Bostco attempts to articulate a third class of individuals treated differently by the municipal tort liability cap set forth in WIS. STAT. § 893.80(3): those who suffer damages worth less than $50,000 and those who suffer damages exceeding $50,000. However, the supreme court has expressly held that the "legislature may . . . impose ceilings on the amount of damages" owed by a municipality. *Holytz*, 17 Wis. 2d at 40. And here, again, the differentiation between the classes can be explained by balancing the legislature's two purposes: "To compensate victims of government tortfeasors while at the same time protecting the public treasury." *See Stanhope*, 90 Wis. 2d at 842. Consequently, while § 893.80(3) may differentiate between the two groups, because it does so on a rational basis, it does not violate the equal protection clause.

¶ 47. Bostco goes on to try to differentiate this case from *Stanhope* and *Sambs* in two ways: (1) by asserting that this case is more like the medical malpractice cap that the supreme court struck down in *Ferdon ex rel. Petrucelli v. Wisconsin Patients Compen-*

*sation Fund*, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440; and (2) by asserting that the $50,000 cap is unreasonably low. We determine that neither assertion is persuasive.

¶ 48. In *Ferdon*, the Wisconsin Supreme Court reviewed the constitutionality of the $350,000 statutory cap on noneconomic damages resulting from medical malpractice, set forth in WIS. STAT. §§ 655.017 and 893.55(4)(d) (2001–02). *Ferdon*, 284 Wis. 2d 573, ¶¶ 7–8. The court concluded that the purpose of the statutes was to enforce tort laws and compensate victims of medical malpractice, while simultaneously keeping costs for health care providers low, in order "to ensure the quality of health care for the people of Wisconsin." *Id.*, ¶¶ 89–96. In doing so, however, the statutes distinguished "between medical malpractice victims who suffer over $350,000 in noneconomic damages, and medical malpractice victims who suffer less than $350,000 in noneconomic damages" without a rational basis. *Id.*, ¶¶ 82, 105.

¶ 49. The supreme court concluded that there was no rational basis between the cap and the legislature's objective because there was no evidence that the cap would manifest itself in lower medical malpractice premiums for physicians, *id.*, ¶¶ 110–29, or lower physician assessments to the Wisconsin Patients Compensation Fund, *id.*, ¶¶ 130–58. Moreover, the court noted that "when the legislature shifts the economic burden of medical malpractice from insurance companies and negligent health care providers to a small group of vulnerable, injured patients, the legislative action does not appear rational." *Id.*, ¶ 101.

██

¶ 50. Bostco argues that like the medical malpractice cap overturned in *Ferdon*, the cap on municipal tort

liability set forth in WIS. STAT. § 893.80(3) "treats differently governmental tort victims who suffer over $50,000 in damages and those who suffer less." However, as we stated previously, the legislature can treat two groups of similarly situated individuals differently, so long as it does so with a rational purpose. *See Nankin*, 245 Wis. 2d 86, ¶ 11. The supreme court concluded in *Stanhope* that it is within the legitimate power of the legislature to ensure that there are sufficient public funds available to enable the government to provide those services which it believes benefit the citizenry and that the statutory cap on tort recovery is rationally related to that purpose. *Id.*, 90 Wis. 2d at 842. Unlike in *Ferdon*, where it was unclear whether there was a link between high damage awards and quality health care, here, it is clear that high damage awards against a municipality could prevent the municipality from providing basic services to the public. In other words, this case is easily distinguishable from *Ferdon*.[9]

---

[9] Bostco also argues, without a pinpoint citation, that *Holytz v. City of Milwaukee*, 17 Wis. 2d 26, 115 N.W.2d 618 (1962), *abrogated in part on other grounds by* WIS. STAT. § 893.80, "makes clear that the government has no legitimate interest in shifting the costs of governmental negligence from the public at large to a handful of victims." That is simply not true. In *Holytz*, the supreme court abrogated the common law doctrine of governmental immunity for tort claims, *id.* at 41, concluding that the doctrine was based on the archaic notion that "the king can do no wrong," *id.* at 33 (citation and quotation marks omitted). However, the supreme court expressly stated that "[i]f the legislature deems it better public policy, it is, of course, free to reinstate immunity. *The legislature may also impose ceilings on the amount of damages.*" *Id.* at 40 (emphasis added). In other words, contrary to Bostco's assertions, the court in *Holytz* expressly permitted the legislature to place caps on governmental tort liability.

¶ 51. Finally, Bostco contends that even if the $50,000 cap was not unduly harsh and arbitrary when it was established in 1981, *see* 1981 Wis. Laws, ch. 63, § 2, the value of $50,000 has so dramatically changed in the last thirty years that the figure has become unduly harsh and arbitrary. The plaintiffs in both *Stanhope* and *Sambs* brought similar challenges to the prior-$25,000 cap. *See Stanhope*, 90 Wis. 2d at 844; *Sambs*, 97 Wis. 2d at 367–68. The supreme court rejected both challenges. *Stanhope*, 90 Wis. 2d at 844; *Sambs*, 97 Wis. 2d at 367–68.

■

¶ 52. Bostco correctly states that "a statutory limit on tort recoveries may violate equal protection guarantees if the limitation is harsh and unreasonable, that is, if the limitation is too low when considered in relation to the damages sustained." *See Ferdon*, 284 Wis. 2d 573, ¶ 111 (footnote and citation omitted). However, the supreme court has also "recognized that whatever the monetary limitation on recovery, the amount will seem arbitrary because it is based on imponderables, and that the legislature, not the court, must select the figure." *Sambs*, 97 Wis. 2d at 367. Consequently, we must accept the statutory limit onrecovery enacted by the legislature "unless we can say that it is very wide of any reasonable mark." *Id.* (citation and quotation marks omitted). In both *Stanhope* and *Sambs*, the supreme court concluded that the $25,000 cap on damages for plaintiffs severely injured in automobile accidents was not "very wide of any reasonable mark." *See Stanhope*, 90 Wis. 2d at 832, 844–45 (reducing plaintiff's $250,000 damages award to $25,000); *Sambs*, 97 Wis. 2d at 358–61 (reducing plaintiff's $949,645.66 damages award to $25,000).

¶ 53. Given the case law and our deference to the legislature in this matter, we cannot say that the

$50,000 damage cap is "very wide of any reasonable mark." *See Sambs,* 97 Wis. 2d at 367 (citation and quotation marks omitted). As we have said previously, it is the role of the legislature to balance its dual purposes: "'To compensate victims of government tortfeasors while at the same time protecting the public treasury." *See Stanhope,* 90 Wis. 2d at 842. We do not wish to interfere with that function.[10]

### 2. WISCONSIN STAT. § 893.80(3) is constitutional as applied to Bostco.

██

¶ 54. Next, Bostco argues that even if we conclude that WIS. STAT. § 893.80(3) is constitutional on its face, it is unconstitutional as applied to Bostco because the District settled claims made by other property owners prior to June 30, 1994, for amounts greater than $50,000. We conclude that the payments the District

---

[10] This is not to say we do not share Bostco's concerns that caps set too low may promote reckless conduct by insulating government actors from the consequences of their actions. However, it is not our role as the court of appeals to determine where to draw the line. As so eloquently set forth by the United States Supreme Court:

> "When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. *But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the Legislature must be accepted unless we can say that it is very wide of any reasonable mark."*

*Stanhope v. Brown Cnty.,* 90 Wis. 2d 823, 843 n.11, 280 N.W.2d 711 (1979) (quoting *Louisville Gas & Elec. Co. v. Coleman,* 277 U.S. 32, 41 (1928)) (emphasis added).

made to property owners who asserted claims prior to June 30, 1994, were rationally based on a legitimate government purpose.

¶ 55. During construction of the Deep Tunnel, the contractor experienced unexpected water inflows from the shallower groundwater aquifers in the soils above the rock layers located 200–300 feet below the ground surface. As a result, buildings in the downtown area "without deep foundations and certain older buildings supported on relatively short timber piles" experienced "structural distress" as a result of soil settlement. The District installed recharge wells to restore groundwater levels and, by 1994, concluded that "[g]roundwater aquifers [had] stabilized," that "[s]tructural settlements [had] stopped," and that "[i]t [was] not expected that damage [would] occur beyond those . . . being evaluated."

¶ 56. The District began reimbursing property owners in the area where settlement occurred "for investigation and repair of damages" resulting from dewatering and settlement during construction. However, in a letter sent to property owners in November 1993, the District informed the property owners that it would no longer reimburse property owners for claims after June 30, 1994. In setting the deadline, the District explained that it was:

> concerned that, for several of the buildings affected by this contract, engineering services for structural investigations and development of repair scopes and construction plans are dragging on for uncommonly long periods of time, thus delaying final repairs and the conclusion of MMSD involvement. *Given the soil conditions in existence for centuries in the area which experienced the settlements and the fact that these settlements have stopped some time ago, it may be difficult to differentiate in the future between those resulting from the groundwa-*

653

> *ter drawdowns and those which may naturally occur, thus making the extent of MMSD involvement unclear.*
>
> *In order to encourage resolution of these matters at an expeditious pace, I will not process for reimbursement . . . any actual repair costs or charges for professional services during construction which will be incurred after June 30, 1994.*
>
> I am sure you understand the advantages both to the MMSD and the building owners of bringing these situations to a close.

(Emphasis added.)

¶ 57. Equal protection is denied when a public body administers a statute with " 'an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances.' " *Village of Menomonee Falls v. Michelson*, 104 Wis. 2d 137, 145, 311 N.W.2d 658 (Ct. App. 1981) (citations omitted). Bostco argues that the District arbitrarily implemented the June 30, 1994 deadline by which it would pay claims without consideration of municipal tort liability caps, thereby treating differently, without a rational basis, building owners whose buildings suffered damage from the dewatering of the groundwater in the area before and after 1994. We disagree.

¶ 58. Disparate treatment is considered arbitrary when it "bears no rational relationship to a legitimate government interest." *State v. Smet*, 2005 WI App 263, ¶ 26, 288 Wis. 2d 525, 709 N.W.2d 474. Here, the District set the June 30, 1994 deadline for claims, believing that it had restored the groundwater levels that harmed buildings during construction. Additionally, the District sought to create a bright line between

claims for damage caused by construction and those caused by non-construction related events. As such, it was reasonable and rational for the District to require that any claims against it be made in a timely manner so that the District could budget and allocate its resources appropriately.

¶ 59. Additionally, the June 30, 1994 deadline was rationally related to the end of the District's potential liability to the contractor under the construction contract, for the costs of repairs to the damaged claimants' property. Rather than undergo the expense and delay of litigation to determine whether the contractor or the District was responsible for the cost of the repairs, the District reasonably determined that it would cover the claims up to the June 30, 1994 deadline.

¶ 60. Consequently, we conclude that WIS. STAT. § 893.80(3) is constitutional as applied.

*3. The District did not waive the municipal damage cap nor is it judicially estopped from raising the issue on appeal.*

¶ 61. In the alternative, Bostco argues that even if the cap on municipal tort liability in WIS. STAT. § 893.80(3) is constitutional, the District waived enforcement of the cap during a May 2, 2005 hearing and is now judicially estopped from asking that the cap be applied. In response, the District contends that it has expressly asserted that the cap applies since it filed its amended answer and that the portion of the May 2 hearing to which Bostco refers to is taken out of context. We agree that the District has not waived its right to apply the cap.

¶ 62. At issue during the May 2 hearing was whether Bostco should be permitted to submit into

evidence an expert report written by Dr. Charles Nelson, in which Dr. Nelson stated that he believed the Deep Tunnel should have been constructed with a concrete liner and that a concrete liner should now be installed to prevent future soil settlement in the downtown area. At the hearing, the District argued that the report unfairly broadened the scope of Bostco's claim. In so contending, counsel for the District stated as follows:

> If the plaintiffs win, they will be made whole based on their damage claim alone. They now seek, by virtue of the Nelson report, to expand this case into one that would require the [D]istrict now to go forward and line the portions of the tunnel at or around the Boston Store, in order to give them some unnamed protection. The [D]istrict objected to that expansion of this.
>
> . . . .
>
> If their damages allow them to recover and get a new foundation that is built and addresses the underlying soil conditions, which is what their damage claim is in the case; lining the tunnel adds nothing. It is not necessary for them. They can have complete and whole relief based on what they have already alleged in this case.

Bostco asserts that the District's counsel's statements that Bostco would "be made whole" and have "whole relief," if Bostco won its case, amounted to an express waiver of the cap on municipal tort liability. That is simply not so.

¶ 63. The Wisconsin Supreme Court "has repeatedly held that [WIS. STAT. § 893.80(3)'s] damage limitation can be waived only if the legislative purposes of § 893.80(3) are met, and a public entity *expressly* waives

the damage limitation." *Anderson v. City of Milwaukee*, 208 Wis. 2d 18, 32, 559 N.W.2d 563 (1997) (emphasis added). Whether a party has expressly waived an issue is a question of law that we review *de novo. See Meyer v. Classified Ins. Corp. of Wisconsin*, 179 Wis. 2d 386, 396, 507 N.W.2d 149 (Ct. App. 1993).

¶ 64. We conclude that the District did not expressly waive the cap. Rather, Bostco asks us to *infer* that the District waived the cap based on a carefully selected excerpt from the May 2 hearing transcript. Both statements made by the District's counsel that Bostco relies on are couched by the term "if": "*If* the plaintiffs win, they will be made whole" and "*If* their damages allow them to recover . . . [t]hey can have complete and whole relief." (Emphasis added.) Such qualifications assume that the District does not successfully assert its affirmative defenses—one of which is statutory caps on damages—and, therefore, can hardly be viewed as express statements of waiver. Furthermore, not only did the District fail to expressly mention the caps, counsel for the District clarified during the hearing that it was merely engaging in a colloquy with the court and was not waiving its legal defenses. The trial court confirmed that it did not interpret the District's statements to amount to a waiver of its defenses. *See Fletcher v. Eagle River Mem'l Hosp., Inc.*, 156 Wis. 2d 165, 168, 456 N.W.2d 788 (1990) (parties' legal concessions are not binding on them or the court).

¶ 65. We also conclude that the District did not take a contrary position on the issue of caps at different times before the trial court and this court. Consequently, judicial estoppel does not apply. *See State v. Johnson*, 2001 WI App 105, ¶ 10, 244 Wis. 2d 164, 628 N.W.2d 431.

C. *Statute of Limitations: The trial court did not
 err in changing the jury's verdict and conclud-
 ing that Bostco's negligence claim is not barred
 by the statute of limitations.*

¶ 66. The District argues that the trial court
erred when it changed the jury's finding that Bostco's
negligence claim arose outside the limitations period set
forth in WIS. STAT. § 893.52.[11] The verdict question
asked the jury: "Should [Bostco] have known or dis-
covered on or before June 4, 1997 that the tunnel as
operated or maintained by the District had caused
damage to the Boston Store building?" The jury an-
swered "yes." In response to Bostco's post-verdict mo-
tion, the trial court changed the jury's answer, finding
that there was no evidence to support the jury's verdict.
The trial court rejected the District's argument that
Bostco should have known that the Deep Tunnel was
the cause of the damage by June 4, 1997.[12] We agree
with the trial court.

██ ██

¶ 67. When considering a motion to change the
jury's answers to verdict questions, the "trial court must
view the evidence in the light most favorable to the
verdict and affirm the verdict if it is supported by any
credible evidence." *Richards v. Mendivil*, 200 Wis. 2d

---

[11] WISCONSIN STAT. § 893.52 states:

An action, not arising on contract, to recover damages for an injury
to real or personal property shall be commenced within 6 years
after the cause of action accrues or be barred, except in the case
where a different period is expressly prescribed.

[12] The trial court stated: "I think it's pretty difficult to
understand how [Bostco] could be responsible for figuring out
or knowing that which, to this very day, the District maintains
wasn't happening."

665, 671, 548 N.W.2d 85 (Ct. App. 1996); *see also* Wis. Stat. § 805.14(1). On review, we determine whether the trial court's decision to change an answer was " 'clearly wrong.' " *Richards*, 200 Wis. 2d at 672 (citation omitted).

¶ 68. The District had the burden of proving its affirmative defense that the statute of limitations had expired. *See Kurt Van Engel Com'n Co. v. Zingale*, 2005 WI App 82, ¶ 42, 280 Wis. 2d 777, 696 N.W.2d 280. A claim does "not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the injury was probably caused by the defendant's conduct." *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 411, 388 N.W.2d 140 (1986). In other words, "discovery does not occur until there is information available to the claimant of the nature of [the] injury, the cause of [the] injury, *and the defendant's part in that cause.*" *Id.* at 414 (emphasis added). "[I]njury and *belief* of its cause, even if correct, do not in themselves trigger the period of limitations." *Id.* at 413 (emphasis added). A plaintiff must also have objective evidence setting forth the defendant's part in causing the injury. *See id.* at 411–14.

¶ 69. It is undisputed that before June 4, 1997, Bostco knew that many of the Boston Store's supporting columns were moving and settling, and that Bostco did not have actual knowledge that the Deep Tunnel was the cause. The statute of limitations dispute centers on whether the record contains credible evidence, not speculation, to support the District's burden of proof and the jury's verdict that Bostco *should have discovered* by June 4, 1997, that the Deep Tunnel was the cause of the movement and settlement. We conclude that there is no such evidence in the record.

¶ 70. The District alleges that testimony from the following witnesses during trial demonstrates that Bostco should have discovered the cause of the damage before June 4, 1997: James Feit, Raymond Bolton, Joseph Zdenek, and Richard Stehly. The District contends that three exhibits entered into evidence during trial also support the jury's verdict: a June 20, 1996 letter from John Papenfus; a January 9, 1997 letter from Zdenek; and a chart entitled "Column Repair Due to Column Movement at Boston Store From 1957–2001." We look at each in turn.

¶ 71. Feit testified that he was employed by Bostco from 1968 or 1969 through 1982 as the Director of Buildings and Construction. He told the jury that Bostco had been monitoring the Boston Store's supporting columns since before 1969 and that beginning in 1969 Bostco hired Graef, Anhalt, Schloemer & Associates, Inc. ("GAS"), a consulting engineering firm, to monitor column movement going forward, replacing a company-employed engineer.

¶ 72. Bolton testified that he was an architect employed by Bostco from 1976 through 1995. Toward the end of his employment, he took over supervision of building and new construction. Bolton testified that during the nineteen years he worked for Bostco, Bostco continually monitored the movement and settlement of the Boston Store's supporting columns and repaired them when GAS recommended it. Bolton did not recall anyone ever telling him that the Deep Tunnel might be the cause of the column movement and settlement.

¶ 73. Zdenek testified that he was employed by Bostco from 1995 through 1998 as the Director of Construction. Zdenek testified that during the time he was employed by Bostco, Bostco continued to have GAS monitor column movement and that Bostco performed

any repair work that GAS recommended. In 1995 and 1996, he observed changes in the Boston Store building, such as wall cracks, that he suspected were from column movement and settlement.

¶ 74. Zdenek also testified that he received a letter from Papenfus of GAS, dated June 20, 1996, telling Bostco that the monitoring data going back to 1990 indicated there was a need for one column and one wall to be repaired in the very near future. The letter also informed Bostco that eight other columns that were "all very stable before 1990" had begun to show some settlement. However, Papenfus did not think the settlement of those eight columns was serious enough to warrant repairs at that time. Nowhere in the letter does Papenfus suggest that there is any evidence of a new event causing the columns to move and settle at a more rapid rate. Nowhere in the letter does Papenfus state, or even suggest, that the Deep Tunnel caused the settlement.

¶ 75. In the exercise of reasonable diligence, Zdenek responded to Papenfus's letter with his own letter to GAS, dated January 9, 1997, requesting a survey of column damage and an assessment as to the root cause of an increase in cracked walls and column movement, specifying that "time [was] of the utmost importance."

¶ 76. Stehly testified as an expert witness for Bostco at trial. He testified that he believed that the cause of the column movement and settlement at the Boston Store after August 7, 1992, was due to downdrag and rot of the piles, and that the downdrag was caused by the lowering of the watertable by the Deep Tunnel. He stated that he reviewed GAS's surveying records and settlement data in forming his opinion.

661

¶ 77. Stehly also summarized a chart entitled "Column Repair Due to Column Movement at Boston Store From 1957–2001," setting forth the number of columns that Bostco repaired between 1957 and 2001: zero from 1957 through 1961; six from 1962 through 1976; eight from 1977 through 1988; and twenty-four from 1990 through 2001.[13]

¶ 78. Neither the testimony nor the exhibits demonstrate that Bostco had objective evidence linking the Deep Tunnel to the movement and settlement of the columns before June 4, 1997.

¶ 79. First, Feit, Bolton, and Zdenek all testified that Bostco had been monitoring column movement and settlement, and repairing damaged columns since at least 1969, long before construction on the Deep Tunnel began. None of them testified that Bostco knew of an objective cause for the column movement or that in later years Bostco suspected that the Deep Tunnel was the cause of the movement. None of them testified that GAS, the engineers employed by Boston Store since 1969, ever suggested that the Deep Tunnel may be a cause for the movement. And the June 20, 1996 Papenfus letter from GAS never even hints that the Deep Tunnel was the cause of the column movement and settlement.

¶ 80. The District contends that Stehly's testimony in particular demonstrates that Bostco *should have known* that the Deep Tunnel was the cause of the column damage and that the trial court was clearly wrong in changing the jury's answer to the contrary. The District argues that because Stehly, in preparation for the 2006 trial, was able to review all of the column

---

[13] The chart, without explanation, does not include data for 1989.

movement data and determine that the Deep Tunnel was causing Boston Store's supporting columns to shift and move, that Bostco should have reviewed that same data and come to the same conclusion before June 4, 1997. However, the District mischaracterizes Stehly's testimony.

¶ 81. Stehly was never asked, nor did he testify to, what Bostco knew or *should have known* on June 4, 1997. Rather, Stehly testified to what his opinions were based upon his review of all of the column-movement data from 1957 to 2001 from a variety of sources. Nothing in the record delineates what sources and data Stehly relied on and whether that same data was available to Bostco on or before June 4, 1997. The District would simply have the jury speculate that Bostco had all the same data in 1997 that Stehly had when he was preparing for the 2006 trial.

¶ 82. The District also incorrectly asserts that Stehly's chart should have led Bostco to conclude that the Deep Tunnel was the cause of the damage because it demonstrated that column movement and settlement accelerated in the 1990s around the time the Deep Tunnel was completed. However, as the District conceded on oral argument, there is no evidence in the record that Bostco had access to the chart prior to June 4, 1997. Furthermore, even if Bostco did have access to the chart, the chart merely demonstrates that column movement and settlement was accelerating. The chart does not show the cause of the acceleration nor does it demonstrate that the accelerated damage "was probably caused by [the District's] conduct." *See Borello*, 130 Wis. 2d at 411. As set forth above, mere "belief of [an injury's] cause" is not sufficient to trigger the statute of limitations. *See id.* at 413.

663

¶ 83. We also reject the District's contention at oral argument, without any cite to the record, that we can infer that the jury knew that the Deep Tunnel had been built and completed around the same time as the Boston Store's accelerated column settlement and thus can further infer that Bostco should have linked the Deep Tunnel to the damage. Again, there was no objective evidence in the record linking the Deep Tunnel to the column movement and settlement and mere belief of a link does not trigger the statute of limitations. *See id.*

¶ 84. In sum, none of the evidence provides a basis for a reasonable person to conclude that Bostco knew or should have known, prior to June 4, 1997, that the Deep Tunnel was the cause of Bostco's damage. Therefore, we conclude that the trial court was not " 'clearly wrong' " when it changed the jury's answer accordingly. *See Richards*, 200 Wis. 2d at 672 (citation omitted).

D. *Notice of Claim: Bostco substantially com-plied with the notice-of-claim requirements in* Wis. Stat. *§ 893.80(1).*

¶ 85. The District argues that Bostco failed to properly serve the District with a notice of claim and itemization of damages as required by Wis. Stat. § 893.80(1). Instead, the District contends that it only received a notice of claim and itemization of damages from WISPARK Holdings, LLC, and Saks, Inc., neither of which is a party in this case and neither of which, according to the District, ever owned the Boston Store building. Bostco counters that it substantially complied with § 893.80(1) and that the District waived the issue when it failed to raise it before the parties had under-

taken substantial litigation. We need not address Bostco's contention that the District waived its notice-of-claim argument, because we conclude that Bostco did satisfy the requirements of § 893.80(1).

¶ 86. WISCONSIN STAT. § 893.80(1) provides that no action may be brought or maintained against any government entity without notice. However, "[o]nly substantial compliance with the notice statute[] is required." *State v. Town of Linn*, 205 Wis. 2d 426, 435, 556 N.W.2d 394 (Ct. App. 1996). " 'The application of [§ 893.80(1)] to a given set of facts is a question of law,' which we review *de novo*." *Thorp v. Town of Lebanon*, 2000 WI 60, ¶ 18, 235 Wis. 2d 610, 612 N.W.2d 59 (citation omitted).

¶ 87. "The statute has two requirements. First, [pursuant to WIS. STAT. § 893.80(1)(a),[14]] a claimant must present the municipality with 'written notice of the circumstances of the claim signed by the party.' " *Town of Linn*, 205 Wis. 2d at 435 (citing § 893.80(1)(a)). This notice-of-injury provision is intended to give government entities an opportunity to investigate and evaluate potential claims. *Thorp*, 235 Wis. 2d 610, ¶ 23. The provision prohibits an action against a government entity "unless a signed 'written notice of the circumstances of the claim' is served on the government entity

---

[14] WISCONSIN STAT. § 893.80(1)(a) states that:

[N]o action may be brought ... against [a government entity] unless:

(a) Within 120 days after the happening of the event giving rise to the claim, written notice of the circumstances of the claim signed by the party ... is served on the [government entity]. Failure to give the requisite notice shall not bar action on the claim if the [government entity] had actual notice of the claim and the claimant shows to the satisfaction of the court that the delay or failure to give the requisite notice has not been prejudicial to the [government entity].

within 120 days of the initial event." *Id.* However, "[e]ven if a claimant fails to comply with the 120–day deadline . . . the claimant may still comply with subsection (1)(a) by showing that the governmental entity had actual notice of the claim and was not prejudiced by the claimant's failure to give the requisite notice." *Id.*

¶ 88. Here, on July 19, 2001, the District received a notice of claim stating that its "construction activities, and installation of and/or maintenance of (or lack thereof) the deep tunnel project" resulted in "significant deterioration in the upper portion of the wooden piles of the foundation" at the downtown Boston Store building "located at 331 West Wisconsin Avenue, Milwaukee, Wisconsin." Consequently, even if the wrong claimants were listed on the notice of claim, the District certainly had actual notice of the injury to the downtown Boston Store in the timeframe required by the statute.[15] Furthermore, there is no evidence that the District was prejudiced by the fact that the wrong claimant was listed on the notice of claim.

■

¶ 89. Second, WIS. STAT. § 893.80(1)(b)[16] sets forth the notice-of-claim provision. *Thorp*, 235 Wis. 2d 610, ¶ 28. Under subsection (b), the notice of claim

---

[15] The District does not argue that it received the notice of claim listing WISPARK and Saks as the claimants outside the 120–day period required by the statute.

[16] WISCONSIN STAT. § 893.80(1)(b) states that:

[N]o action may be brought . . . against [a government entity] unless:

(b) A claim containing the address of the claimant and an itemized statement of the relief sought is presented to the appropriate clerk or person who performs the duties of a clerk or secretary for the [government entity] and the claim is disallowed.

must: " '(1) identify the claimant's address; (2) contain an itemized statement of the relief sought; (3) be submitted to the city clerk; and (4) be disallowed by the city.' " *Town of Linn*, 205 Wis. 2d at 438–39 (citation omitted; formatting altered). "Two principles help determine the sufficiency of a claim under subsec[tion] (b): (1) the notice must provide the municipality with the information necessary to decide whether to settle the claim, and (2) the notice must preserve bona fide claims." *Id.* at 439.

¶ 90. The District does not argue that elements (2) through (4) were not satisfied. Instead, it merely argues that the notice of claim did not properly identify the claimants in this case and that the "law does not require government entities to guess at their peril about who is the actual claimant." In so arguing, however, the District ignores the complex relationship between WISPARK, Saks, and Bostco. The record clearly demonstrates that all three corporations were overlapping entities who shared executive employees. In fact, the District acknowledges that Saks owned Parisian, who is a party in this case, and WISPARK is owned by the same holding company as Bostco. Moreover, the notice of claim set forth the name and address of the attorneys representing the injured party, and an "attorney's address is considered the equivalent of the claimant's address for the purpose of the notice of claim statute." *See DNR v. City of Waukesha*, 184 Wis. 2d 178, 198, 515 N.W.2d 888 (1994), *abrogated on other grounds by State ex rel. Auchinleck v. Town of LaGrange*, 200 Wis. 2d 585, 596–97, 547 N.W.2d 587 (1996).

¶ 91. In summary, Bostco substantially complied with WIS. STAT. § 893.80(1)'s notice requirements. The notice of claim and itemization of damages put the District on notice of the particulars of the damage done

at the downtown Boston Store, provided the District with enough information to determine whether it wished to settle the claim, and properly preserved a bona fide claim.

## II. Nuisance

¶ 92. Two issues arise with respect to Bostco's nuisance claim. First, we address whether the trial court erred in refusing to reverse the jury's finding that Bostco did not suffer "significant harm," despite the jury's conclusion that Bostco suffered millions of dollars in damages. Because we conclude that millions of dollars in damages, as a matter of law, is significant harm, we reverse. Second, having determined that Bostco established its nuisance claim, we then turn to whether the WIS. STAT. § 893.80(3) damage cap applies to nuisance. We conclude that it does.

¶ 93. We do not repeat our discussion of the District's cross-appeals on immunity, the statute of limitations, and notice-of-claim because our conclusions on those subjects in the previous section apply to nuisance, just as they do to negligence.

A. *Significant Harm: The jury's conclusion that the District's negligence caused Bostco millions of dollars in past damages establishes "significant harm" as a matter of law.*

¶ 94. Bostco argues that the trial court erred when it failed to grant Bostco's post-verdict motion to change the jury's answer from "no" to "yes" regarding whether Bostco suffered significant harm. The jury's finding that Bostco did not suffer significant harm

668

prevented Bostco from establishing its nuisance claim. Bostco contends that the jury's finding that Bostco suffered $2.1 million in past property damages[17] is inconsistent with the jury's no-significant-harm finding, and that, as a matter of law, $2.1 million is significant harm pursuant to *Jost v. Dairyland Power Cooperative*, 45 Wis. 2d 164, 172 N.W.2d 647 (1969). We agree.

¶ 95. A private nuisance is "an unreasonable interference with the interests of an individual in the use and enjoyment of land." *Krueger v. Mitchell*, 112 Wis. 2d 88, 103, 332 N.W.2d 733 (1983). In order to establish a nuisance claim, a plaintiff must demonstrate that: (1) the defendant was negligent; (2) the negligence caused an interference with the plaintiff's use and enjoyment of its land; (3) the interference resulted in significant harm; and (4) the interference can be abated in a reasonable time and manner. *See* Wis JI-Civil 1922 (2010).

¶ 96. " 'Significant harm' means harm involving more than a slight inconvenience or petty annoyance. . . . If ordinary persons living in the community would regard the interference as substantially offensive, seriously annoying or intolerable, then the interference is significant." *Id.* "Rights and privileges to use and enjoy land are based on the general standards of ordinary persons in the community and not on the standards of persons who are more sensitive than ordinary persons." *Id.*

---

[17] The jury found that Bostco suffered $3 million in past damages and apportioned thirty percent of the total negligence to Bostco; thus, the jury concluded that the District's negligent conduct caused Bostco $2.1 million in past damages.

¶ 97. Here, the jury concluded that the District was "negligent in the manner in which it operated or maintained the tunnel near the Boston Store," that the negligence "interfered with [Bostco]'s use and enjoyment of [its] building, and that the District can "abate the interference by reasonable means and at a reasonable cost." However, the jury concluded that the interference did not "result in significant harm" to Bostco, despite its finding that Bostco suffered $2.1 million in past damages attributable to the District.

¶ 98. Bostco filed a post-verdict motion asking the trial court to reverse the jury's answer with respect to significant harm, arguing that *Jost* stands for the proposition that, as a matter of law, $2.1 million in damages constitutes significant harm. The trial court denied the motion.

¶ 99. Normally, we sustain the jury's verdict if it is supported by any credible evidence. *See Krueger*, 112 Wis. 2d at 104–05. But here, because the issue is whether the facts found by the jury fulfill a particular legal standard, the applicable standard of review is *de novo. See Kersten v. H.C. Prange Co.*, 186 Wis. 2d 49, 56, 520 N.W.2d 99 (Ct. App. 1994).

¶ 100. We agree with Bostco that *Jost* mandates a change in the jury's answer regarding significant harm. In *Jost*, farmers living near the Dairyland Power Cooperative filed a claim in nuisance, arguing that the sulfur dioxide gas emitted into the air by the Cooperative damaged the farmers' alfalfa crops, "killed pine trees, caused screens to rust through rapidly, and made flower raising difficult or impossible." *Id.*, 45 Wis. 2d at 167–68. The jury, although finding that even the least damaged farmer experienced at a minimum $290 in

damages, concluded that the farmers did not suffer significant harm. *Id.* at 170–71.

¶ 101. The supreme court concluded that "[h]aving found such sums to be justly owing, it appears that by no rationalization can it be concluded that the sums properly payable did not constitute 'substantial damage.' " *Id.* at 171–72. The supreme court went on to hold that the damage was substantial as a matter of law because the farmers demonstrated an "obvious injury to tangible property" and because the injury was "of such a nature that the jury placed more than a nominal value upon the injury done." *Id.* at 172.

¶ 102. Such is the case here. As a matter of law, the jury could not conclude that the harm was insignificant having also concluded that the District's negligence interfered with Bostco's use and enjoyment of its property to such an extent that Bostco was awarded $2.1 million in past damages. If "ordinary persons in the community" would conclude that rusty screen doors, an inability to grow flowers, and $290 in damages is significant harm, certainly those same "ordinary persons in the community" would conclude that $2.1 million in damages to the timber pilings upon which a building is founded is significant harm. *See* Wis JI-Civil 1922; *Jost*, 45 Wis. 2d at 171–72. Certainly, $2.1 million in damages is "more than a nominal value upon the injury done." *See Jost*, 45 Wis. 2d at 172.

¶ 103. The District attempts to combine the question of whether Bostco suffered significant harm with the question of whether the District's negligence interfered with Bostco's use and enjoyment of its land. In doing so, the District argues that Bostco has not demonstrated significant harm because it "presented no evidence that the claimed interference resulted in busi-

671

ness interruptions, annoyance, discomfort, or any other type of 'use and enjoyment' harm."

¶ 104. In so arguing, however, the District unfairly ignores the jury's finding that the District's negligence *did* interfere with Bostco's use and enjoyment of its property. Furthermore, while the District is correct that Bostco did not demonstrate a disruption to the regular operation of the Boston Store, it was not required to do so to demonstrate it suffered significant harm. Bostco's proof that it suffered $2.1 million in past damages demonstrated that the District's interference caused "more than a slight inconvenience" and was "substantially offensive, seriously annoying or intolerable" and therefore, that Bostco suffered significant harm. *See* WIS JI-CIVIL 1922.

> B. *Municipal Damage Caps: The* WIS. STAT. *§ 893.80(3) damage cap applies to nuisance claims.*

■■■

¶ 105. Unfortunately for Bostco, our analysis of nuisance does not end with significant harm. Although we conclude that Bostco did in fact prove its nuisance claim, it cannot recover the entirety of its damages because nuisance is founded in tort, and as set forth above, an action founded in tort is limited by the $50,000 cap set forth in WIS. STAT. § 893.80(3).

¶ 106. Bostco argues that the WIS. STAT. § 893.80(3) cap does not apply to continuing nuisance claims because the cap applies to "any *action* founded on tort," *see* § 893.80(3) (emphasis added), and a continuing nuisance is not a single action but constitutes multiple, successive actions so long as the continuing nuisance is not abated. *See Sunnyside Feed Co. v. City of*

*Portage*, 222 Wis. 2d 461, 470, 588 N.W.2d 278 (Ct. App. 1998) (defining a continuing nuisance as "an ongoing or repeated disturbance or harm" that "can be discontinued or abated"). In response, the District counters that a continuing nuisance really constitutes multiple *causes of action,* to wit, multiple claims, that make-up one *action* and, therefore, the damage cap applies.

¶ 107. We need not determine whether Bostco's claim here is a continuing nuisance or whether a continuing nuisance amounts to multiple causes of action, that is, multiple claims. Only one nuisance *action* is before us. The only question before this court is whether *this* singular action founded in tort is capped at $50,000 per person. *See* WIS. STAT. § 893.80(3); *see also Patrick Fur Farm, Inc. v. United Vaccines, Inc.,* 2005 WI App 190, ¶ 8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (appellate courts should decide cases on the narrowest possible grounds). We conclude that for the same reasons we set forth previously, the cap on municipal tort liability applies here, and because there is only one nuisance *action* before us, under § 893.80(3), Bostco's recovery is capped at $50,000.

## III. Inverse Condemnation

¶ 108. Bostco argues that the trial court erred in dismissing its inverse condemnation claim on summary judgment because Bostco produced ample evidence from which a jury could conclude that the District had taken, without just compensation: (1) Bostco's groundwater; and (2) several of Bostco's timber piles by rendering them practically or substantially useless for all reasonable purposes. We disagree.

¶ 109. We review orders granting summary judgment *de novo,* applying the same methodology as the trial court. *See Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 314–16, 401 N.W.2d 816 (1987). Summary judgment is properly granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Wis. Stat. § 802.08(2).

■■

¶ 110. Wisconsin Stat. § 32.10, Wisconsin's inverse condemnation statute, permits a landowner to recover damages when, without exercising its condemnation power, a government entity restricts or prohibits an owner's use of his or her property.[18] *See Koskey v. Town of Bergen,* 2000 WI App 140, ¶ 1 n.1, 237 Wis. 2d 284, 614 N.W.2d 845. ("Inverse condemnation is a procedure where a property owner petitions the circuit court to institute condemnation proceedings."); § 32.10. "The standard for determining a violation under . . . § 32.10 is generally the same as that for a taking under art. I, § 13 [of the Wisconsin Constitution]." *Kohlbeck v. Reliance Constr. Co.,* 2002 WI App 142, ¶ 23, 256 Wis. 2d 235, 647 N.W.2d 277.

---

[18] Wisconsin Stat. § 32.10 states, in relevant part:

**Condemnation proceedings instituted by property owner.** If any property has been occupied by a person possessing the power of condemnation and if the person has not exercised the power, the owner, to institute condemnation proceedings, shall present a verified petition to the circuit judge of the county wherein the land is situated asking that such proceedings be commenced. . . . If the court determines that the defendant is occupying such property of the plaintiff without having the right to do so, it shall treat the matter in accordance with the provisions of this subchapter assuming the plaintiff has received from the defendant a jurisdictional offer and has failed to accept the same and assuming the plaintiff is not questioning the right of the defendant to condemn the property so occupied.

¶ 111. In Wisconsin, "two types of governmental conduct can constitute a taking: (1) 'an actual physical occupation' of private property or (2) a restriction that deprives an owner 'of all, or substantially all, of the beneficial use of his property.' " *E-L Enters., Inc. v. Milwaukee Metro. Sewerage Dist.*, 2010 WI 58, ¶ 22, 326 Wis. 2d 82, 785 N.W.2d 409 (citation omitted). Bostco has not demonstrated that it can produce sufficient facts to demonstrate that the District engaged in either sort of conduct.

██

¶ 112. First, Bostco has failed to submit facts sufficient to demonstrate that the District physically occupied Bostco's property. *See id.*, ¶ 36. Instead, Bostco argues that the Deep Tunnel, which the trial court found was located 160 feet east of Bostco's property, drained the groundwater beneath Bostco's property and damaged its timber piles. At no point does Bostco allege facts which demonstrate that the District physically occupied Bostco's property and took either its groundwater or its timber piles.

¶ 113. Moreover, the Wisconsin Supreme Court rejected a similar argument made by the plaintiff in *E-L Enterprises*. In *E-L Enterprises*, E-L asserted that the District "physically occupied or directly appropriated E-L's groundwater," without justly compensating E-L, when the District pumped out the groundwater from a trench adjacent to E-L's property during the construction of the Deep Tunnel. *Id.*, ¶ 23. The supreme court expressly held that the District did not physically occupy E-L's property because the District removed the groundwater by way of a trench that was not located or constructed on E-L's property. *Id.*, ¶ 24. Similarly, here,

Bostco has not demonstrated that the District physically occupied Bostco's property to take the timber pilings or the groundwater.

¶ 114. Second, Bostco has failed to demonstrate that the District imposed a restriction which " 'practically or substantially renders [Bostco's] land useless for all reasonable purposes.' " *See Howell Plaza, Inc. v. State Highway Comm'n*, 92 Wis. 2d 74, 85, 284 N.W.2d 887 (1979). "A taking can occur absent [a] physical invasion only where there is [(1)] a legally imposed restriction upon the property's use," *id.* at 88, that (2) " 'deprives the owner of all, or substantially all, of the beneficial use of [the] property,' " *id.* at 87 (citation omitted).

¶ 115. Bostco articulates no legally imposed restriction. However, even if we presume that Bostco wishes to challenge those governmental regulations defining the parameters of the Deep Tunnel's construction, Bostco cannot demonstrate that those regulations " 'practically or substantially render[] [Bostco's] land useless for all reasonable purposes' " because Bostco has not demonstrated that it was ever prevented from using its property for its intended purpose. *See id.* at 85 (footnote and citation omitted).

¶ 116. Again, the supreme court's holding in *E-L Enterprises* guides us. There, the supreme court concluded that E-L could not claim that the District "deprived E-L of all, or substantially all, of the beneficial use of its building" because the dewatering of the groundwater and subsequent rotting timber piles never prevented E-L from leasing the property. *See id.*, 326 Wis. 2d 82, ¶ 35. Similarly, Bostco does not claim that it

ever had to close the Boston Store or was otherwise unable to utilize the building for its intended purpose because of the dewatering or rotting piles.

¶ 117. In summary, *E-L Enterprises* requires us to affirm the trial court's dismissal of Bostco's inverse condemnation claim because *E-L Enterprises* holds that, as a matter of law, damaging a building's timber piles through off-property conduct affecting groundwater levels cannot rise to a takings claim unless the plaintiff loses all or substantially all of the value of the property. Bostco has not made that showing. Therefore, we affirm the trial court.

## IV. WISCONSIN STAT. § 101.111

¶ 118. Next, we address Bostco's assertion that the trial court erred in dismissing its WIS. STAT. § 101.111 claim on summary judgment. In its amended complaint, Bostco claimed that § 101.111 entitled it to at least $10 million in damages and an injunction abating the continuing nuisance, plus expenses and attorney fees. On summary judgment, the District argued that, as a matter of law, Bostco's § 101.111 claim fails because Bostco is not an adjoining property owner under the statute. Rather, the District alleged that Bostco's property adjoins the property owned by the Grand Avenue, that the Deep Tunnel travels down an easement within Grand Avenue's property, and, therefore, that the Deep Tunnel is not adjoining Bostco's property. The trial court agreed with the District and dismissed the claim at summary judgment. We affirm the trial court but on other grounds.

¶ 119. WISCONSIN STAT. § 101.111, entitled "Excavations; protection of adjoining property and buildings"

(emphasis omitted), requires "excavator[s]" to protect "excavation site[s] . . . so as to prevent the soil of adjoining property from caving in or settling." *See* § 101.111(2). The statute defines an " 'excavator' " as an "owner of an interest in land making or causing to be made an excavation." *See* § 101.111(1). The statute limits the scope of liability to only those excavations "made to a depth in excess of 12 feet below grade." *See* § 101.111(3)(a), (b). The statute also requires an excavator to give advance notice to the adjoining property owners of the intent to excavate, *see* § 101.111(4), and it provides that an aggrieved person may commence an action for an injunction against an excavator who fails to comply with the statute to "restrain[] the excavator from further violation," *see* § 101.111(6). Finally, the statute provides that a successful injunction action shall include an award for costs, disbursements, and actual attorney fees. *See id.*

¶ 120. We review matters of statutory construction independently of the trial court. *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 22, ¶ 11, 308 Wis. 2d 103, 746 N.W.2d 762. Upon review, we determine the legislature's intent by giving the statute's words their plain meaning. *Kenison v. Wellington Ins. Co.*, 218 Wis. 2d 700, 704–05, 582 N.W.2d 69 (Ct. App. 1998). We conclude that the words of WIS. STAT. § 101.111 and the process described within it, make it clear that the legislature did not intend for the statute to apply here. It is undisputed that there was no "cave-in," and that the excavation of the Deep Tunnel had been completed many years prior to Bostco's claim.

¶ 121. We conclude that neither the purpose of WIS. STAT. § 101.111 nor the remedies it provides fit

Bostco's application here. The purpose of the statute is clearly to put property owners on notice before and during an excavation so that property owners may take steps to stop the excavation or protect their property. *See* § 101.111(4). The statute is intended to cover situations where solid material is removed from the surface causing cave-ins along the sides of adjoining property. *See* § 101.111(2). The remedy provided by the statute is to stop the excavation. § 101.111(6). No other remedy is set forth. The statute's limited remedy underscores that the design of the statute is to address an imminent or ongoing excavation. The remedy provided does not include damages allegedly caused by failure to repair or maintain an underground tunnel, dug over a decade earlier, which over time caused, not cave-ins, but settling of the soil due to dewatering. *See id.*

¶ 122. Accordingly, we affirm the trial court's dismissal of the Wis. Stat. § 101.111 claim at summary judgment.

## V. Injunctive Relief

¶ 123. Finally, the District argues that the trial court erred in granting Bostco's injunction motion and ordering the District to install a concrete liner in that portion of the Deep Tunnel one-half mile north and one-half mile south of the downtown Boston Store, at an estimated cost of $10 million. We agree and reverse.

¶ 124. After the post-verdict motions, the trial court imposed the Wis. Stat. § 893.80(3) damage cap on Bostco's successful negligence award. Bostco then re-

filed its motion for injunctive relief.[19] In its motion, Bostco argued that the imposition of the caps irreparably harmed Bostco, leaving it with no other remedy except an injunction. *See American Mut. Liab. Ins. v. Fisher*, 58 Wis. 2d 299, 305, 206 N.W.2d 152 (1973). Bostco argued that the jury found that the District negligently caused it harm, that the evidence at trial demonstrated that if that portion of the Deep Tunnel one-half mile north and one-half mile south of the Boston Store was not lined with concrete Bostco's timber piles would continue to be harmed, and that after the trial court imposed the $50,000 cap on liability Bostco had no adequate remedy at law. The trial court agreed.

¶ 125. The District's arguments against the injunction are numerous. Generally speaking, the District argues that the trial court erred when it ordered the injunction because: (1) WIS. STAT. § 893.80 bars injunctive relief; (2) procedurally the time for requesting injunctive relief had passed; and (3) the District was not provided an adequate opportunity to present evidence and rebut Bostco's injunction motion.

 

¶ 126. "Normally, injunctive relief is ordered in the discretion of the trial court, and this court will not change the trial court's decision unless it is an erroneous exercise of discretion." *Forest Cnty. v. Goode*, 215 Wis. 2d 218, 225, 572 N.W.2d 131 (Ct. App. 1997). A trial court "properly exercises its discretion when it examines the relevant facts, applies a proper standard of law,

---

[19] Bostco also sought injunctive relief in its amended complaint. However, the trial court ruled that it would not consider that claim until after trial. Consequently, after trial and after the trial court granted the District's post-verdict motion to impose the damage cap, Bostco filed a motion for injunctive relief.

and, using a demonstrated rational process, reaches a conclusion that a reasonable court could reach." *Flottmeyer v. Circuit Court for Monroe Cnty.*, 2007 WI App 36, ¶ 17, 300 Wis. 2d 447, 730 N.W.2d 421.

■■

¶ 127. A trial court may not issue an injunction unless (1) there is the threat of irreparable injury that (2) cannot be compensated with a remedy at law. *American Mut. Liab. Ins.*, 58 Wis. 2d at 305. However, the common law requirements for obtaining injunctive relief may be modified by statute. *Kohlbeck*, 256 Wis. 2d 235, ¶ 14.

■

¶ 128. Whether WIS. STAT. § 893.80 prohibits the trial court from granting injunctive relief is a question of statutory interpretation that we review *de novo*. *See The Warehouse II, LLC v. DOT*, 2006 WI 62, ¶ 4, 291 Wis. 2d 80, 715 N.W.2d 213. When engaging in statutory construction, our overarching purpose is to ascertain the intent of the legislature. *County of Columbia v. Bylewski*, 94 Wis. 2d 153, 164, 288 N.W.2d 129 (1980). In order to do so, we are to give effect, "if possible, to each and every word, clause and sentence in [the] statute," and we should avoid "a construction that would result in any portion of a statute being superfluous." *Id.*

¶ 129. We conclude that the trial court improperly exercised its discretion and incorrectly construed WIS. STAT. § 893.80 to permit injunctive relief that would, in effect, render the damage cap set forth in WIS. STAT. § 893.80(3) superfluous.

¶ 130. To begin, we conclude that the plain language of WIS. STAT. § 893.80 does not permit the trial court to grant an injunction that would circumvent the statutory caps. Section 893.80(5) states, in pertinent part, that:

> the provisions and limitations of [§ 893.80] *shall be exclusive* and shall apply to all claims against a [government entity] . . . . When rights or remedies are provided by any other statute against any [government entity] . . . such statute shall apply and the limitations in sub. (3) shall be inapplicable.

(Emphasis added.) In other words, the language "shall be exclusive," limits a plaintiff's recovery to those remedies set forth in § 893.80, unless some other statute applies. Here, Bostco does not argue that it has "rights or remedies . . . provided by any other statute." *See* § 893.80(5). As applied here, § 893.80(3) and (5) modify the availability of injunctive relief. *See Kohlbeck*, 256 Wis. 2d 235, ¶ 14. Consequently, the cap on municipal torts set forth in § 893.80(3) provides the exclusive remedy for a plaintiff, namely, a limited $50,000 damage award, and prohibits the trial court from ordering injunctive relief.

¶ 131. Second, we also agree with the District that to read WIS. STAT. § 893.80(3) and (5) as the trial court suggests renders the statute meaningless. We strive to avoid such absurd results when interpreting statutes. *See Peters v. Menard, Inc.*, 224 Wis. 2d 174, 189, 589 N.W.2d 395 (1999) (statutes should be construed so as to avoid absurd results); *State v. Setagord*, 211 Wis. 2d 397, 427, 565 N.W.2d 506 (1997) ("Statutes are to be construed to avoid rendering any part of the statute meaningless or superfluous."). To protect the public treasury, the legislature made a measured and conscious decision to limit recovery for those injured by tort at the hands of the government to $50,000. The " 'notion that [the legislature] would limit liability . . . with respect to one remedy while allowing the sky to be the limit with respect to another for the same violation

strains credulity.' " *See Andrews v. Chevy Chase Bank*, 545 F.3d 570, 575 (7th Cir. 2008) (citation omitted).[20]

¶ 132. Bostco, of course, disagrees with this interpretation of Wis. Stat. § 893.80. With respect to Wis. Stat. § 893.80(3), Bostco argues: (1) "[t]he amount it may cost [the District] to comply with the trial court's [injunction] order is not an 'amount recoverable by any person' " as required by subsection (3); (2) "[i]f the legislature truly meant that no lawsuit should burden a municipality with more than $50,000 in costs to it, plaintiffs would rarely collect anything"; and (3) if the legislature had intended to prohibit injunctive relief, it could have explicitly done so as it did with punitive relief.

¶ 133. We dismiss all three arguments because each ignores the underlying purpose of Wis. Stat. § 893.80: "To compensate victims of government tortfeasors while at the same time protecting the public treasury." *See Stanhope*, 90 Wis. 2d at 842. Given that purpose, it simply makes no sense to permit plaintiffs to end-run around the limitation § 893.80(3) sets on recovery and nullify the statute's intent. From the standpoint of the public treasury, there is little difference in practice between a monetary damage award given to a plaintiff to remedy its harm and an injunction order requiring the defendant to abate the harm.

¶ 134. As for Wis. Stat. § 893.80(5), Bostco merely contends that the statute is not an issue because while "[t]he parties disagree as to whether § 893.80(3) ought

---

[20] Neither party addresses how the separation of powers may be affected by any real or imagined conflict between Wis. Stat. § 893.80 and the court's traditional powers in equity. Accordingly, we do not address the issue.

to apply in this case at all . . . what is not in dispute is that there is no . . . damage cap other than § 893.80(3) that would potentially apply." We glean from this statement that Bostco is arguing that § 893.80(5) only makes exclusive the *damage cap* set forth in § 893.80(3) unless another statute provides otherwise, and, therefore, does not prohibit injunctive relief. We fail to see how this is so when § 893.80(5) generally states that "the *provisions and limitations* of this *section* shall be *exclusive,*" thereby not limiting the exclusivity to either the statutory damage cap or even to subsection (3). (Emphasis added.) Moreover, Bostco does not elaborate upon its claim to provide us any guidance. *See Kristi L.M. v. Dennis E.M.,* 2007 WI 85, ¶ 20 n.7, 302 Wis. 2d 185, 734 N.W.2d 375 (stating that the appellate court is not required to address undeveloped arguments).

¶ 135. Lastly, Bostco contends that the District waived its right to raise WIS. STAT. § 893.80(3) and (5) as a defense to the injunction because it did not do so in its motion to dismiss. According to Bostco, WIS. STAT. § 802.06(7) required the District to raise all possible defenses in its motion to dismiss. Because the District did not do so, Bostco argues that the defense has been waived. We disagree.

¶ 136. WISCONSIN STAT. § 802.06(7)[21] "requires that a party who makes a motion under [§ 802.06] include any defense or objection then available to the party

---

[21] WISCONSIN STAT. § 802.06(7) states, in pertinent part:

CONSOLIDATION OF DEFENSES IN MOTIONS. A party who makes a motion under this section may join with it any other motions herein provided for and then available to the party. If a party makes a motion under this section but omits therefrom any defense or objection then available to the party which this section permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted . . . .

which [§ 802.06] permits to be raised by a motion." *Schroff v. Schroff*, 85 Wis. 2d 505, 515, 271 N.W.2d 379 (1978). A party "may not subsequently make a *motion* based on the defense or objection so omitted," except for a number of delineated exceptions which do not apply here. *See id.* (emphasis added).

¶ 137. Here, the District did not raise the Wis. Stat. § 893.80 defense in a second motion to dismiss filed pursuant to Wis. Stat. § 802.06. Instead, the District raised the defense in *response* to Bostco's injunction motion. Consequently, § 802.06(7) does not apply, and the District has not waived the defense.

*By the Court.*—Judgment affirmed in part; reversed in part.